IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JASEN D. HANSEN,                              )
                                             )
                    Plaintiff,               )     TC-MD 140096C
                                             )
        v.                                   )
                                             )
LANE COUNTY ASSESSOR,                        )
                                             )
                    Defendant.               )     **FINAL DECISION**

This Final Decision incorporates without change the court's Decision entered October 14, 2014. The court did not receive a request for an award of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 19.

Plaintiff appeals the real market value of property identified as Account 1686938 (subject property) for the 2013-14 tax year. A trial was held by telephone on September 10, 2014. Plaintiff, an Oregon-licensed certified general appraiser with an MAI designation from the Appraisal Institute, appeared and testified on his own behalf. Bryce Krehbiel (Krehbiel) and Faith Bowlsby (Bowlsby) appeared and testified for Defendant. Bowlsby prepared Defendant's appraisal report. Plaintiff's Exhibits 3, 6, and 7 were received without objection. Defendant's Exhibits A to G, J to Y, and AA were received without objection.

## I. STATEMENT OF FACTS

The subject property is Plaintiff's residence. The home is a 3,558 square foot, two-story structure built in 2006, and has four bedrooms and three bathrooms.[1] (Def's Exs A at 1, B at 1, 4, C at 1, 3, 5.) The home has an oversized two-car garage, and sits on a 0.27 acre (11,761 square feet), irregularly shaped lot. (Ptf's Ex 3 at 1; Def's Exs C at 1, D at 1, E at 1.)

---

[1] The evidence conflicts in some respects on the number of bedrooms, as discussed below, but the court finds that the home has four bedrooms and three bathrooms.

Bowlsby testified that Defendant's original records indicated that the home had a total of 3,420 square feet of finished living area, with three bedrooms and two and one-half bathrooms. (*See also* Def's Ex B at 1.) Bowlsby testified that she inspected the property on June 18, 2014, in preparation for her testimony, and determined that there were errors in Defendant's records related to the size of the home, the number of bedrooms, certain features and amenities, and the class of the home. Defendant determined that the home was slightly larger (3,558 square feet) and the garage slightly smaller (660 square feet) than Defendant's records had shown. (Def's Ex C at 1.) Defendant changed the home's class from a six to a five-plus. (*Compare* Def's Ex B at 1 *with* Def's Ex C at 1.) Defendant appears to agree Plaintiff's home has four bedrooms, not three, although the county records Defendant submitted into evidence (the RLID records), printed August 26, 2014 (two weeks before the trial), still show only three bedrooms and the lesser, incorrect square footage of the home (3,420 square feet).[2] (Def's Ex B at 1.) However, Bowlsby's written narrative, which are notes from her physical inspection of the subject property, indicate that the home does indeed have 3,558 square feet. (Def's Ex C at 1.)

The subject property is a nice quality home. According to Bowlsby's uncontroverted testimony, which is supported by Defendant's documentary evidence, the subject property is a modern contemporary style home with composition lap siding that features some stucco on the front exterior façade, a covered two-story column entry in the front of the home and a similar matching column entry in the rear of the home, additional paving behind the garage, a small

---

[2] On cross examination, Bowlsby asked Plaintiff a number of questions about the subject property, including the size of the lot compared to Plaintiff's comparables, and the size of the garage. Bowlsby never questioned or challenged the bedroom count in Plaintiff's appraisal or his trial testimony, both of which describe the subject property as a four bedroom home. (Ptf's Ex C at 1.) And, in its case-in-chief and closing argument, Defendant focused on the subject property's overall square footage, neighborhood characteristics, the age of the subject property and Defendant's comparable sales, the home's classification (five-plus versus six), and the proximity of the sale dates of Defendant's comparable sales to the applicable assessment date. Defendant made very little mention of the bedroom count.

utility shed, a tiled hip roof, vaulted ceilings, some tile floors in the kitchen and bathrooms, granite counters in the kitchen, and a long, brick paver driveway. (Def's Exs A at 2, C at 1.) Bowlsby's uncontroverted testimony was that the home also has a covered brick patio at the back of the home with an outdoor grill and granite counter(s).

As for location of the home, the parties agree that the subject property is in a neighborhood of class 5 and class 6 homes, identified by Defendant as an A-minus or A2 neighborhood, meaning that the area has primarily class 5 homes. (Def's Ex C at 1.) Bowlsby testified that the surrounding neighborhoods feature lesser-quality class 3 and 4 homes. (*See also* Def's Ex C at 1.)

Defendant set the RMV of the subject property at $571,333, with $119,556 allocated to the land and $451,777 to the improvements. (Ptf's Compl at 2.) Plaintiff appealed that value to the local county board of property tax appeals (Board), and the Board reduced the RMV slightly to $557,000. (*Id*.) The Board's reduction of $14,333 was applied to the RMV of the improvements; the land RMV was not changed. (*Id*.) The maximum assessed value (MAV) and assessed value (AV) are $369,928; the Board's RMV reduction did not lower those values because of the state constitutional and statutory scheme for setting those values.[3] (*See id*.)

/ / /

/ / /

---

[3] Under Oregon law, RMV represents the market value (*i.e.*, likely selling price) of a property. ORS 308.205. MAV was established in 1997 as 90 percent of the property's 1995 RMV on the rolls, with annual increases thereafter of three percent. Or Const, Art XI, §11(1)(a) ) (providing that a property shall have a MAV for the 1997-98 tax year "that does not exceed the property's real market value for the tax year beginning July 1, 1995, reduced by 10 percent."); Or Const, Art XI, § 11(1)(b) (providing that "[f]or tax years beginning after July 1, 1997, the property's maximum assessed value shall not increase by more than three percent from the previous tax year"); ORS 308.146(1) (providing that MAV is the greater of 103 percent of the property's prior year AV, or 100 percent of the property's prior year MAV). Finally, AV is the lesser of the property's RMV or MAV. ORS 308.146(2). Thus, whereas RMV is tied to market conditions that can vary each year both in terms of direction (up or down) and magnitude, MAV is a simple mathematical calculation based on an annual increase of three percent. And, AV is simply the lesser of RMV or MAV. ORS 308.146(2).

Plaintiff appealed the Board's order to this court, requesting a further reduction in the RMV to $400,000. (*Id*. at 1.) Defendant filed an Answer requesting there be no change in the RMV or AV. (Def's Ans at 1.)

Plaintiff had three exhibits admitted at trial. The first is an excerpt from an appraisal report for the subject property. (Ptf's Ex 3.) That document includes five comparable sales, all located within a few blocks of the subject property. (*Id*.) Three of the five sales (comparables 1 through 3) occurred within six months immediately prior to the January 1, 2013, assessment date for the tax year at issue. (*Id*. at 1-2.) The other two sales (comparables sales 4 and 5) occurred in July and August 2011. (*Id*. at 2.) Plaintiff testified that all five sales are "highly comparable" to the subject property (his personal residence) and noted that only minor adjustments were made for differences in size, number of garage spaces (two versus three), room count, and age. No location adjustment was made due to the physical proximity of the comparable sales to the subject property. The three sales occurring in the last half of 2012 (comparable sales 1 through 3) sold for $405,000, $360,000, and $485,000, respectively. (*Id*. at 1.) The sale dates were September 27, 2012, December 7, 2012, and July 24, 2012, respectively. (Ptf's Exs 3 at 1; 6 at 1, 3; Def's Ex T at 1.) Plaintiff's adjusted sale prices for those properties are $392,500, $388,000, and $421,350, respectively. (Ptf's Ex 3 at 1.) Those adjusted sale prices translate to per-square-foot prices (rounded to the nearest dollar) of $115, $139, and $102, respectively. Defendant used Plaintiff's comparable 1 in its valuation table. (Def's Ex J at 1.) Defendant applied a time trend to the to the $405,000 September 2012 sale price which increased the "trended" sale price to $407,714, or $135 per square foot. (*Id*.)

/ / /

/ / /

Plaintiff's second exhibit is the Multiple Listing Service (MLS) information for four of Plaintiff's five comparable sales. (Ptf's Ex 6.) For reasons not explained at trial, the sales information for Plaintiff's comparable sale 3 is not part of that exhibit.

Plaintiff's third exhibit includes a table showing the fluctuation of "the average and median sale price for all homes sold in Greater Lane County, Oregon." (Ptf's Ex 7.) That graph shows a rise in both average and median sale prices from December 2003 to a peak on or about June 2007, followed by a decline in prices until sometime between December 2011 in June 2012, followed by a low rise in average prices through June 2013. (*Id.*) Plaintiff testified that the graph shows that both average and median sale prices were fairly stable from 2011 to January 2013, and that prices then began to increase after January 1, 2013. The graph generally supports that testimony.[4] Plaintiff noted that his five comparable sales all occurred before January 1, 2013.

Twenty-four of Defendant's exhibits were admitted into evidence, but for purposes of the valuation issue presented by this appeal, the court will discuss only several of those exhibits because many of Defendant's exhibits are not pertinent to the valuation issue presented by this appeal. Defendant's Exhibit C contains a value estimate Bowlsby calculated by trending back to January 1, 2013, the sum of (1) the value of the newly discovered improvements and amenities she observed during her June 2014 inspection and (2) Defendant's January 1, 2014, value for Plaintiff's property. (Def's Ex C at 2.) Bowlsby's value estimate under that approach is $525,602. (*Id.*)

/ / /

---

[4] Two points are worth noting. First, prices declined from June 2011 through June 2012, and then rose slightly through approximately September 2012, followed by another lesser, decline in prices. (Ptf's Ex 7.) Second, average and median sale prices rose fairly sharply through approximately July or August 2013, and then began declining at about the rate they had been rising for the first seven or eight months of that year. (*Id.*)

Defendant's other exhibit directly relevant to the value of the subject property is Bowlsby's table of comparable sales. (Def's Ex J.) Bowlsby used six comparable sales, all class 5-plus homes, similar in size to the subject property, and in the same neighborhood classification as the subject property (neighborhoods comprised of class 5 and class 6 homes; primarily class 5 homes). (*Id.*) Three of the six sales occurred in 2012; one in June and two in September. (*Id.*) The other three homes sold in March, May, and July 2013. (*Id.*) Defendant's six comparable sales were of homes built between 1998 and 2006. (*Id.*) The subject was built in 2006. Bowlsby adjusted the sale prices for time (*i.e.*, market conditions) and then converted those adjusted sale prices to a price per square foot. (*Id.*) Bowlsby's adjusted price per square foot ranged from a low of $135 to a high of $167. (*Id.*) Bowlsby calculated the average price per square foot to be $153 and concluded that the value of the subject property was $555,048 as of January 1, 2013. (*Id.*) Bowlsby's testimony was that the value of Plaintiff's home was $156 per square foot, which she used in arriving at her $555,048 value estimate. The estimated value would be $544,374 using the $153 per square foot average value reported by Bowlsby in Defendant's Exhibit J.[5]

## II. ANALYSIS

The issue before the court is the RMV of the subject property for the 2013-14 tax year. ORS 308.205(1) defines RMV:[6]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

[5] The court arrived at that number by multiplying Bowlsby's corrected square footage for the home (3,558 square feet) by her $153 per square foot average value derived from the six comparable sales Defendant included in its comparable sales grid. (Def's Ex J.)

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

For the 2013-14 tax year, the assessment date was January 1, 2013. *See* ORS 308.007; ORS 308.210.

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's RMV on the tax roll is incorrect. *See* ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). Taxpayers cannot sustain the burden of proof merely through noting errors in a county's position, but must instead "provide competent evidence of the RMV of their property." *Poddar v. Dept of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (Mar 13, 2012).

There are three separate approaches to valuation – cost approach, sales comparison approach, and income approach – that are to be considered in valuing a property. *Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 252 (2003); OAR 150-308.205-(A)(2)(a). Although each approach must be reviewed, the court may determine that all three cannot be reasonably applied to the subject property's valuation. OAR 150-308.205-(A)(2)(a). Ultimately, the selection of the appropriate valuation approach is a question of fact "to be determined by the court upon the

record." *Pacific Power & Light Co. v. Dept. of Rev. (Pacific Power)*, 286 Or 529, 533, 596 P2d 912 (1979).

This court has previously noted that value is a range rather than an absolute. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977). Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

In this case both parties used the sales comparison approach. This court has previously stated:

> "Under the sales comparison approach, the value of a property is derived by comparing the subject property with similar properties, called comparable sales. That comparison is based on many factors, and adjustments are made for any differences between the comparable sales and the subject property so that the appraiser can derive a value for the subject property. * * *."

*Magno v. Dept. of Rev.*, 19 OTR 51, 58 (2006) (internal quotation marks and citation omitted); *see also* OAR 150-308.205-(A)(2)(c) (stating that "[i]n utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used"). Thus, "[t]he court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of a property. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003).

Plaintiff valued the subject property at $400,000 using five comparable sales. (Ptf's Ex 3.) All Plaintiff's comparable sales were located within the same neighborhood as the subject property, and all but his comparable sale 3 were built around the same time as the subject property. Plaintiff made a negative $24,250 adjustment to comparable sale 3 because that property was only approximately one year old, compared to seven years for the subject property.

(*Id.*)  That adjustment appears to be five percent (assuming it is based on a sheer difference in age).[7]  While five percent might seem low, Plaintiff submitted an exhibit showing that the market declined between 2006, when the subject property was built, and January 1, 2013.  (Ptf's Ex 7 at 1.)  Defendant did not challenge that evidence.  Accordingly, Plaintiff's negative $24,250 age adjustment seems appropriate to the court.

On cross-examination by Krehbiel, Defendant raised two concerns with Plaintiff's appraisal.  The first concern regarded the disparity between the size of Plaintiff's lot compared to the lots on which the five comparable sales are situated.  Plaintiff's home sits on an 11,761-square-foot lot, whereas Plaintiff's comparable sales sit on lots between 6,534 square feet (comparable 2) and 9,147 square feet (comparable 4).  (Ptf's Ex 3 at 1-2.)  Plaintiff, who is a certified appraiser with an MAI designation from the Appraisal Institute, responded that, while his lot is larger than the comparable sales, his lot is also an irregularly-shaped flag lot and that much of the square footage is not really usable.  A review of the aerial photographs submitted by Defendant supports that testimony.  (Def's Ex E.)  Plaintiff struck the court as knowledgeable and sincere in his explanation, and the court found his reasoning persuasive.

Defendant's second concern was over the adjustments that were and were not made to Plaintiff's comparable sales for differences in the size of the garages.  Krehbiel and Bowlsby noted that three of Plaintiff's five comparable sales had negative adjustments of $7,500 for differences in garages compared to the subject property.  (Ptf's Ex 3 at 1-2.)  They noted that the same dollar adjustment was made to all three comparables with larger garages, but that no adjustments were made for the two comparable sales (2 and 3) that had smaller garages.  Moreover, the garage for comparable 5, Defendant noted, was only 47 square feet larger whereas

---

[7] Plaintiff's sale number three sold for $485,000.  (Ptf's Ex 3 of 1.)

the garages for comparables 1 and 4 were approximately 150 square feet larger – yet all received the same negative $7,500 dollar adjustment. (*Id*.) Plaintiff responded by noting that the $7,500 adjustment to the three comparables was due to the fact that they had true three car garages that would hold three cars whereas his home had an oversized two-car garage. Plaintiff's appraisal did indicate that the comparables received the $7,500 adjustment because they had "[s]uperior three car garages." (*Id*. at 1.) Plaintiff noted further that the percentage of the adjustment was only one or two percent. The court found Plaintiff's explanation for the adjustment reasonable and persuasive.

Turning to Defendant's valuation evidence, Defendant had two valuation approaches and the court finds neither to be convincing or persuasive. Bowlsby's first valuation estimate was simply a process of adjusting the county's 2014 preliminary value determination for Plaintiff's home by adding the newly discovered improvements and additional square footage and "back valuing," or trending (backwards) that value to January 1, 2013. The court finds such a mechanical process to be without merit. Similar approaches have often been presented to the court by inexperienced taxpayers, and the court has generally, if not universally, rejected those simplistic methodologies because they are not tied to the market in a viable way.

Defendant's second valuation approach, while tied to the market, is similarly unpersuasive because of Bowlsby's simplistic methodology. Bowlsby simply time trended six comparable sales, derived a per-square-foot value range, and then extracted an "average" value per square foot, which she then multiplied by the size of the subject property to arrive at a value estimate for Plaintiff's home. (Def's Ex J.) Bowlsby testified to the similarities between her comparable sales and the subject property, but made no adjustments for the differences between those properties and the subject property, such as year built, dwelling size, lot size, date of sale,

etc., notwithstanding the fact that she challenged Plaintiff's appraisal for failing to make similar adjustments. Because of those deficiencies, the court places no weight on Defendant's valuation evidence or conclusions.

### III. CONCLUSION

After carefully considering the evidence, the court finds that Plaintiff has established by a preponderance of the evidence that the value of the subject property was $400,000 as of January 1, 2013. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted, and that the real market value of the property identified as Account 1686938 was $400,000 on January 1, 2013.

Dated this _____ day of October 2014.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Dan Robinson on October 31, 2014. The court filed and entered this document on October 31, 2014.*